Scott Edelsberg (SBN 330990)
**EDELSBERG LAW, P.A.**
1925 Century Park E #1700
Los Angeles, CA 90067
Telephone: 305.975.3320
scott@edelsberglaw.com

*Counsel for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **WILLIAM LEMON**, individually and on behalf of all other similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>**FINANCIAL ADMINISTRATIVE SUPPORT SERVICES**,<br><br>Defendant. | Case No. ______________<br><br>JURY TRIAL DEMANDED |

Plaintiff William Lemon ("Plaintiff") brings this Class Action Complaint against Financial Administrative Support Services ("Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. This class action arises from a security breach, which allowed cybercriminals to access Defendant's computer network, exfiltrate files containing

the personally identifiable information ("PII" or "Private Information") of Plaintiff and Class Members (the "Data Breach" or "Breach"). As a direct result, Plaintiff and Class Members have suffered damages, including the imminent, ongoing threat of further harm from the criminal misuse of their stolen Private Information.

2. Defendant is an accounting and financial consulting services company that assists non-profits ("Defendant's Clients" or "Clients") with their accounting and administrative needs.[1]

3. On May 26, 2025, Defendant identified suspicious activity on its computer network. Again, on June 11, 2025, Defendant identified further suspicious activity on its same computer network. Subsequent investigations determined that unauthorized actors accessed and acquired files from Defendant's network and systems prior to March 26, 2025, and then again between June 8, 2025, and June 11, 2025, containing the following categories of sensitive Private Information belonging to Plaintiff and Class Members: names and Social Security numbers.[2]

4. Critically, the unauthorized actors breached Defendant's network twice. Even after Defendant identified suspicious activity on May 26, 2025, and purportedly "took steps to secure its network", Defendant failed to contain the threat.

5. As a result, the unauthorized actors regained access to the very same network less than two weeks later, and acquired files from Defendant's network and systems.

6. On or around September 25, 2026, ***over a year*** after discovering the Data Breach, Defendant began to send individualized notice letters to victims of the

[1] *See* https://fassaccountants.com/ (last visited Oct. 2, 2026).
[2] *See* Defendant's notice letter, attached hereto as Exhibit A.

Data Breach informing them that their Private Information was exfiltrated in the Data Breach ("Notice Letter(s)").[3]

7. Because Defendant stored and handled Plaintiff's and Class Members' highly sensitive Private Information in connection with providing its services, it had a duty and obligation to safeguard this information and prevent unauthorized third parties from accessing this data.

8. Ultimately, Defendant failed to fulfill this obligation, as unauthorized cybercriminals breached its information systems and databases and stole vast quantities of Private Information belonging to Plaintiff and Class Members. The Data Breach—and the successful exfiltration of Private Information—were the direct, proximate, and foreseeable results of multiple failings on the part of Defendant.

9. The Data Breach occurred because Defendant failed to implement reasonable security protections to safeguard its information systems and databases. Moreover, before the Data Breach occurred, Defendant failed to inform the public and its Clients that its data security practices were deficient and inadequate. Had Plaintiff and Class Members been made aware of this fact, they would have never provided such information to Defendant's Clients who in turn provided the Private Information to Defendant. Defendant's unreasonable delay in alerting victims of the Data Breach prevented Plaintiff and Class Members from taking earlier actions to protect themselves against fraud and misuse of their information.

10. Accordingly, Plaintiff brings this action individually and on behalf of all those similarly situated to seek relief for the consequences of Defendant's failure to reasonably safeguard Plaintiff's and Class Members' Private Information and its

[3] *Id.*

failure to reasonably provide timely notification to Plaintiff and Class Members that their Private Information had been compromised.

11. Upon information and belief, Plaintiff's Private Information is available on the dark web as a result of the Data Breach.

12. The fact that an unauthorized actor removed the Private Information means that the data was not merely accessed or viewed but was affirmatively exfiltrated from Defendant's systems. This exfiltration dramatically increases the risk that the data has been, or will be, sold, published, or used for identity theft, insurance fraud, phishing, social engineering, and other malicious purposes. Once removed by an unauthorized actor, there is no mechanism to retrieve, recall, or "un-steal" the data.

13. Despite the highly sensitive nature of the Private Information it collected, maintained, and stored, and despite its obligations under federal and state law, Defendant failed to implement and maintain reasonable and adequate data security measures sufficient to protect Plaintiff's and Class Members' Private Information from the foreseeable risk of unauthorized access and exfiltration.

14. As a result of Defendant's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its contractual, statutory, and common-law obligations, Plaintiff and Class Members suffered and will suffer injuries, including but not limited to:

a. Theft of their Private Information;

b. Lost or diminished value of their Private Information;

c. Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

d. Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to

the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges;

e. Time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the Data Breach; and

f. The continued and increased risk of compromise to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

15. Plaintiff brings this action to hold Defendant accountable and to obtain damages and other appropriate relief including, among other relief, relief sufficient to address the costs of adequate credit monitoring and identity theft protection services to Plaintiff and Class Members.

## II. THE PARTIES

16. Plaintiff is a citizen and resident of Bainbridge Island, Washington.

17. Defendant is a California corporation with its principal place of business located at 3180 Newberry Drive, STE 200, San Jose, CA 95118.

## III. JURISDICTION AND VENUE

18. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100 and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

19. This Court has personal jurisdiction over Defendant because Defendant maintains its headquarters and principal place of business within this District. Defendant conducts substantial business in this District, and the claims arise from Defendant's conduct directed at and emanating from this District.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts, events, and/or omissions giving rise to Plaintiff's claims occurred in this District, including Defendant's maintenance and storage of Plaintiff's and Class Members' Private Information at and through systems operated from this District.

## IV. COMMON FACTUAL ALLEGATIONS

### A. Defendant's Collection and Storage of Private Information.

21. Defendant is an accounting and financial consulting services company that assists its Clients with their accounting and administrative needs.[4]

22. In order to provide its services, Defendant collects, maintains, and stores large volumes of Private Information belonging to Plaintiff and Class Members that it receives from its Clients as part of its general business operations.

23. By collecting, storing, and maintaining the Private Information of Plaintiff and Class Members, Defendant owed a duty to Plaintiff and Class Members to protect and safeguard their Private Information from unauthorized disclosures.

24. Upon information and belief, Defendant failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing Plaintiff's and Class Members' Private Information.

---

[4] *See* https://fassaccountants.com/ (last visited Oct. 2, 2026).

25. Plaintiff and Class Members indirectly provided their Private Information to Defendant through their dealings with Defendant's Clients, and Plaintiff and Class Members had a reasonable expectation that any entity with access to their Private Information would keep that sensitive Private Information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, Defendant would provide them with prompt and accurate notice.

26. This expectation was objectively reasonable and based on an obligation imposed on Defendant by statute, regulations, industry custom, and standards of general due care.

27. Unfortunately for Plaintiff and Class Members, Defendant failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security. As a result, it failed to protect Plaintiff and Class Members from having their Private Information accessed and stolen during the Data Breach.

**B. The Data Breach.**

28. On May 26, 2025, Defendant identified suspicious activity on its computer network. Again, on June 11, 2025, Defendant identified further suspicious activity on its same computer network. Subsequent investigations determined that unauthorized actors accessed and acquired files from Defendant's network and systems prior to March 26, 2025, and then again between June 8, 2025, and June 11, 2025, containing the following categories of sensitive Private Information belonging to Plaintiff and Class Members: names and Social Security numbers.[5]

29. On or around September 25, 2026, ***over a year*** after discovering the Data Breach, Defendant began to send Notice to victims of the Data Breach

[5] Ex. A.

informing them that their Private Information was exfiltrated in the Data Breach. The Notice states as follows:

> **What Happened?** On May 26, 2025, FASS identified suspicious activity on our computer network. In response, we took steps to secure our network and restore our systems. On June 11, 2025, further suspicious activity was identified. Upon identifying the subsequent activity, FASS brought our systems offline to ensure their security and investigate the nature and scope of the activity. The investigation determined that an unknown actor gained access to certain FASS systems prior to March 26, 2025, and then again between June 8, 2025, and June 11, 2025, and accessed and/or copied off certain information.
>
> As part of the investigation, we initiated a thorough and comprehensive review of the impacted information to determine what information was involved and to whom it relates. Recently, the review concluded and determined that your information was within the impacted data.
>
> **What Information Was Involved?** The information identified in the review includes your name and the following: Social Security number. At this time, we have no evidence of any actual or attempted identity theft or fraud as a result of this event.[6]

30. The Notice Letters that Defendant sent are deficient and exacerbate the circumstances for victims of the Data Breach. The deficiencies in the Notice Letters include that (1) Defendant fails to state whether it was able to contain or end the cybersecurity threat, leaving victims to fear whether the Private Information that Defendant continues to maintain is secure; (2) Defendant fails to state how the Data Breach itself occurred; (3) Defendant fails to state the exact date that it discovered the Data Breach; (4) Defendant fails to state the exact date that the Data Breach occurred, instead only naming that the Data Breach occurred "prior to" March 26, 2025, and a subsequent three day period; and (5) Defendant failed to timely notify victims after the Data Breach occurred, waiting ***over one year*** to begin sending

---

[6] ***Id.***

Notice, thereby depriving victims of the earliest opportunity to take preventative measures to protect their Private Information. All of this information is vital to victims of a data breach, let alone a data breach of this magnitude due to the sensitivity of information compromised in this specific breach.

31. Despite Defendant's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice Letters, including: a) that this Data Breach was the work of cybercriminals; b) that the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data); and c) that once inside Defendant's networks and systems, the cybercriminals targeted information including Plaintiff's and Class Members' Private Information and other sensitive information for download and theft.

32. Moreover, in its Notice Letters, Defendant failed to specify whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendant, and whether Defendant set up any mechanism for Class Members to report any misuse of their data.

33. As the Notice Letter itself confirms, the Data Breach was not a single event. Defendant was on actual notice of unauthorized activity on its network no later than May 26, 2025. Yet Defendant's response was so deficient that the unauthorized actors were able to infiltrate the same network a second time between June 8, 2025, and June 11, 2025.

34. Upon information and belief, had Defendant implemented reasonable incident response measures upon discovering the first intrusion, including identifying and closing the point of entry, resetting compromised credentials, and

monitoring its network for further unauthorized activity, the second intrusion would not have occurred.

35. Due to Defendant's inadequate security measures, Plaintiff and the Class Members now face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

36. Upon information and belief, the Private Information was not encrypted prior to the Data Breach.

37. Upon information and belief, the cyberattack was targeted at Defendant as a company that collects and maintains valuable personal data of many individuals, including Plaintiff and Class Members.

38. Upon information and belief, the cyberattack was expressly designed to gain access to private and confidential data, including (among other things) the Private Information of Plaintiff and Class Members.

39. Defendant had obligations to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

40. Plaintiff and Class Members indirectly provided their Private Information to Defendant through their dealings with Defendant's Clients with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

41. Upon information and belief, Defendant made promises to its Clients, and Plaintiff and Class Members, regarding the maintenance and protection of Plaintiff's and Class Members' Private Information, demonstrating an understanding of the importance of securing Private Information.

42. Acknowledging the harm that the Data Breach presents, Defendant offered victims one year of complimentary credit monitoring services – an offer that is inadequate considering that victims of the Data Breach will likely suffer an increased risk of identity theft and other harms for years into the future, if not for their respective lifetimes.[7]

## C. The Data Breach Was a Foreseeable Risk of Which Defendant Was on Notice.

43. Plaintiff and Class Members value their Private Information, as in today's electronic-centric world, their Private Information is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

44. It is well known that Private Information, including Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

45. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting institutions that collect and store Private Information, like Defendant, preceding the date of the Data Breach.

46. In light of recent high-profile data breaches, Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

47. In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year. [8]

48. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are

[7] *Id.*

[8] 2024 Data Breach Report 6, Identity Theft Res. Ctr. (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporation information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[9]

49. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[10]

50. Individuals place a high value not only on their Private Information, but also on the privacy of that data. For the individual, identity theft causes significant negative financial impact on victims as well as severe distress and other strong emotions and physical reactions.

51. In light of recent high profile data breaches at other industry leading companies, including, T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), LoanDepot (16.9 million affected, January 2024), Evolve Bank & Trust (7.6 million affected, May 2024), Financial Business and Consumer Solutions (4.2 million affected, February 2024), and Prudential Financial (2.5 million affected, February 2024), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

[9] Catalin Cimpanu, *Ransomware Mentioned in 1,000+ SEC Filings Over the Past Year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

[10] *Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Oct 2., 2026).

52. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

53. Additionally, as companies became more dependent on computer systems to run their business, *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.

54. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

55. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

56. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgment of its duties to keep the Private Information private and secure, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and the proposed Class from being compromised.

**D. Defendant Could Have Prevented the Data Breach.**

57. Data breaches are preventable.[11] "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[12] "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[13]

58. Most reported data breaches "are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[14]

59. Here, many failures laid the groundwork for the Data Breach.

60. The Federal Trade Commission ("FTC") has published guidelines that establish reasonable data security practices for businesses.[15]

61. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[16]

62. The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.[17]

---

[11] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thomson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[12] *Id.* at 17.
[13] *Id.* at 28.
[14] *Id.*
[15] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[16] *Id.*
[17] *Id.*

63. The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[18]

64. According to information and belief, Defendant failed to follow reasonable and necessary industry standards to prevent a data breach, including the FTC's guidelines.

65. Defendant was at all times fully aware of its obligation to protect the Private Information of consumers under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act"), yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

66. Based on allowing its security certificates to lapse and upon information and belief, Defendant also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in cybersecurity readiness.

[18] *Id.*

67. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[19]

68. To prevent and detect the attack here, Defendant could and should have taken, as recommended by the Federal Bureau of Investigation, the following measures:

- Implemented an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enabled strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scanned all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configured firewalls to block access to known malicious IP addresses.
- Patched operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.

[19] *See How to Protect Your Networks from RANSOMWARE*, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view. (last visited Oct. 2, 2026)

- Managed the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configured access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disabled macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implemented Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Considered disabling Remote Desktop protocol (RDP) if it is not being used.
- Used application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Executed operating system environments or specific programs in a virtualized environment.

- Categorized data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[20]

69. According to information and belief, Defendant failed to do any of the above.

70. To prevent and detect cyberattacks, Defendant could and should have recommended that its employees, as recommended by the United States Cybersecurity & Infrastructure Security Agency, take the following measures:

- Updated and patched your computer. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.
- Used caution with links and when entering website addresses. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net).

---

[20] *Id.* at 3–4.

- Opened email attachments with caution. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
- Kept your personal information safe. Check a website's security to ensure the information you submit is encrypted before you provide it.
- Verified email senders. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
- Inform yourself. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.
- Used and maintain preventative software programs. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[21]

71. In addition, to prevent and detect the Data Breach Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

[21] *See Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (revised Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (internal citations omitted).

- Harden internet-facing assets
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audits
- Thoroughly investigate and remediate alerts.
  - Prioritize and treat commodity malware infections as potential full compromise of the system
- Include IT professionals in security discussions.
  - Ensure collaboration among security operations, security administrators, and information technology administrators to configure servers and other endpoints securely
- Build and maintain credential hygiene
  - Use multifactor authentication or network level authentication and enforce strong, randomized, just-in-time local administrator passwords
- Apply principle of least-privilege
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events
- Harden infrastructure
  - Utilize Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection

- Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications[22]

72. Specifically, among other failures, Defendant had far too much confidential unencrypted information held on its systems. Such Private Information should have been segregated into an encrypted system.[23]

73. Given that Defendant was storing the Private Information of a significant number of individuals, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks. However, Defendant failed to do so.

74. Moreover, it is well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed.[24]

75. The FTC has repeatedly emphasized the importance of disposing of unnecessary Private Information: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[25] Rather than following this basic standard of care, Defendant kept individuals' unencrypted Private Information on its inadequately secured systems indefinitely.

76. In sum, the Data Breach could have been easily prevented through standard practices like the use of industry standard network segmentation, redaction, and encryption of all Private Information—which, upon information and belief, Defendant negligently failed to do.

---

[22] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT INTELLIGENCE (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/. (last visited Oct. 2, 2026)

[23] *See* Adnan Raja, *How to Safeguard Your Business Data With Encryption*, DATAINSIDER (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption (last visited Oct. 2, 2026).

[24] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[25] *Id.* at 6.

77. Further, the scope of the Data Breach could have been dramatically reduced had Defendant utilized proper record retention and destruction practices—but Defendant negligently did no such thing.

**E. Defendant Had a Duty to Plaintiff and Class Members to Secure Private Information.**

78. At all relevant times, Defendant owed a duty of care to Plaintiff and Class Members to properly secure their Private Information, protect their Private Information from unauthorized disclosure, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class Members, and to *promptly* notify Plaintiff and Class Members when Defendant became aware that their Private Information may have been compromised.

79. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff and the Class Members, on the other hand. The special relationship arose because Plaintiff and the Members of the Class relied on Defendant to secure their Private Information when they entrusted Defendant's Clients with the Private Information, and when the Clients in turn entrusted the Private Information to Defendant.

80. Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiff and Class Members.

81. Security standards commonly accepted among businesses that store Private Information using the internet include, without limitation:

a. Maintaining a secure firewall configuration;

b. Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c. Monitoring for suspicious or irregular traffic to servers;

d. Monitoring for suspicious credentials used to access servers;

e. Monitoring for suspicious or irregular activity by known users;

f. Monitoring for suspicious or unknown users;

g. Monitoring for suspicious or irregular server requests;

h. Monitoring for server requests for Private Information;

i. Monitoring for server requests from VPNs; and

j. Monitoring for server requests from Tor exit nodes.

82. The ramifications of Defendant's failure to keep Private Information secure are long lasting and severe. Once Private Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims is likely to continue for years.

**F. The Value of Personally Identifiable Information.**

83. The Private Information of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200,[26] and bank details can have a price range of $30 to over $4,000.[27]

---

[26] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 2, 2026).

[27] https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 2, 2026).

84. As a growing number of federal courts have begun to recognize the loss of value of Private Information as a viable damages theory, the sale of Private Information from data breaches, as in the Data Breach alleged herein, is particularly harmful to data breach victims – especially when it takes place on the dark web.

85. The dark net is an unindexed layer of the internet that requires special software or authentication to access.[28] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[29] This prevents dark web marketplaces from being easily identifiable to authorities or those not in the know.

86. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, sensitive personal information like the Private Information at issue here.[30] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth and other personal

---

[28] *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Oct. 2, 2026).

[29] *Id.*

[30] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Oct. 2, 2026).

information.[31] As Microsoft warns, "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[32]

87. Plaintiff's and Class Members' Private Information is a valuable commodity, a market exists for Plaintiff's and Class Members' Private Information (which is why the Data Breach was perpetrated in the first place), and Plaintiff's and Class Members' Private Information is likely being sold by hackers on the dark web (as that is the *modus operandi* of data thieves) – as a result, Plaintiff and Class Members have lost the value of their Private Information, which is sufficient to plausibly allege injury arising from a data breach.

88. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[33] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[34] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[35]

89. The Private Information stolen in this specific Data Breach was particularly harmful.

90. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular personal privacy and credit monitoring service LifeLock by Norton notes "Five

---

[31] *Id.*; *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Oct. 2, 2026).

[32] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Oct. 2, 2026).

[33] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Oct. 2, 2026).

[34] https://datacoup.com/ (last visited Oct. 2, 2026).

[35] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Oct. 2, 2026).

Malicious Ways a Thief Can Use Your Social Security Number," including: 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts," and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft; and 5) Utility Fraud.

91. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised in the Data Breach, are among the worst kinds of private information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

92. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [36] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[37]

93. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name.

[36] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use, and%20other%20private%20information%20increases. (last visited Oct. 2, 2026).

[37] *Id.*

> Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[38]

94. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[39] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[40]

95. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

96. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[41]

---

[38] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Oct. 2, 2026).

[39] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Oct. 2, 2026).

[40] *See* https://www.investopedia.com/terms/s/ssn.asp (last visited Oct. 2, 2026).

[41] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Oct. 2, 2026).

97. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.")

98. Private Information can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[42]

99. Given the nature of Defendant's Data Breach, as well as the unreasonable delay in notification to Class Members, it is foreseeable that the compromised Private Information has been or will be used by hackers and

[42] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.

cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain Plaintiff's and Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

100. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures.

**G. The Harm Caused by the Data Breach Now and Going Forward.**

101. Victims of data breaches are susceptible to becoming victims of identity theft for years to come. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9).

102. The type of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft and Plaintiff and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

103. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web, where malicious actors buy and sell that information for profit.[43]

104. For example, when the U.S. Department of Justice announced its seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent

---

[43] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Aug. 20, 2026).

documents that could be used to assume another person's identity.[44] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [Private Information] belonging to victims from countries all over the world."[45]

105. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft-related crimes discussed below.

106. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

107. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victim.

108. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz"

---

[44] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018) https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Oct. 2, 2026).
[45] *Id.*

packages.[46]

109. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

110. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information, such as emails, phone numbers, or credit card numbers, may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

**H. Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

111. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[47] Defendant did not rapidly

[46] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited Oct. 2, 2026).

[47] *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020) https://www.fbi.gov/news/stories/2019-internet-crime-report-released-

report to Plaintiff and Class Members that their Private Information had been stolen. Defendant did not notify impacted people for over 200 days after learning of the Data Breach.

112. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

113. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

114. These efforts are consistent with the U.S. Government Accountability Office, which released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[48]

115. These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after

---

021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion (last visited Oct. 2, 2026).

[48] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Oct. 2, 2026).

a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[49]

## I. Diminution of Value of Private Information

116. Private Information is a valuable property right.[50] The value is axiomatic, considering the value of Big Data in corporate America, and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that Private Information has considerable market value.

117. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

118. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the

[49] *See* Federal Trade Commission, *IdentityTheft.gov*, https://www.identitytheft.gov/Steps (last visited Oct. 2, 2026).

[50] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

119. As a result of the Data Breach, the Private Information of Plaintiff and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiff and Class Members, or likely to be suffered as a direct result of Defendant's Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendant with the mutual understanding that Defendant would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further injurious breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

### J. Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary

120. In addition to a remedy for economic harm, Plaintiff and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

121. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes.

122. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

123. As a result, Plaintiff and Class Members also request relief in the form of the future cost of credit and identity theft monitoring, which is reasonable and necessary. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach.

## **PLAINTIFF'S EXPERIENCES AND INJURIES**

***Plaintiff's Experiences***

124. Plaintiff is a donor of one of Defendant's Clients, and provided his Private Information to Defendant's Clients, who in turn provided his Private Information to Defendant in connection with the services Defendant provides.

125. At all times relevant, Defendant maintained Plaintiff's Private Information on its systems.

126. Plaintiff received a Notice Letter, by U.S. mail, directly from Defendant, which was dated September 25, 2026.[51] According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by

[51] Ex. A.

unauthorized third parties in Defendant's Data Breach.

127. Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant's Clients had he known of Defendant's lax data security policies.

128. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, as well as reviewing credit reports and financial account statements. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

129. Plaintiff suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) misuse of Private Information; (ii) invasion of privacy; (iii) theft of his Private Information; (iv) lost or diminished value of Private Information; (v) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vi) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

## CLASS ALLEGATIONS

130. Plaintiff brings this class action, individually and on behalf of the following Class under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

> Nationwide Class
> All persons in the United States whose Private Information was compromised as a result of the Data Breach, including all individuals who were sent a Notice Letter (the "Class").

131. Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

132. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

133. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

134. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Although the precise number of such persons is unknown, and the facts are presently within the sole knowledge of Defendant, upon information and belief, Plaintiff estimates that the Class is comprised of at least tens of thousands of members. The Class is sufficiently numerous to warrant certification.

135. Typicality of Claims: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class, had his Private Information compromised because of the Data Breach. Plaintiff is a member of the Class, and his claims are typical of the claims of the members of the Class. The harms suffered by Plaintiff are similar to those suffered by all other Class Members, which were caused by the same misconduct by Defendant.

136. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, or in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

137. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

138. Commonality and Predominance: Defendant engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and Class Members' Private Information was stored on the same network and unlawfully accessed in the same way. There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b) Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c) Whether Defendant's storage of Plaintiff's and Class Members' Private Information was done in a negligent manner;

d) Whether Defendant had a duty to protect and safeguard Plaintiff's and Class Members' Private Information;

e) Whether Defendant's conduct was negligent;

f) Whether Defendant's conduct violated Plaintiff's and Class Members' privacy;

g) Whether Defendant took sufficient steps to secure individuals' Private Information; and

h) The nature of relief, including damages, to which Plaintiff and Class Members are entitled.

139. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of

each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

140. Manageability: The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

141. Ascertainability: Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

142. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

143. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses, as evidenced by the

fact that Defendant has sent individualized notice letters to victims of the Data Breach.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## NEGLIGENCE AND NEGLIGENCE *PER SE*
## (On Behalf of Plaintiff and the Class)

144. Plaintiff restates and realleges paragraphs 1 through 143 as if fully set forth herein.

145. Defendant knowingly collected the Private Information of Plaintiff and Class Members through its Clients and stored and maintained the Private Information on inadequately secured computer systems and networks.

146. Upon accepting and storing Plaintiff's and Class Members' Private Information on their computer systems and networks, Defendant undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information from unauthorized access and disclosure.

147. Defendant had full knowledge of the sensitivity of the Private Information in its possession and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully accessed or disclosed. Plaintiff and Class Members were therefore the foreseeable victims of any inadequate data security practices.

148. Defendant owed a duty to exercise reasonable care in designing, implementing, maintaining, monitoring, and testing its networks, systems, protocols, policies, procedures and practices to ensure that Plaintiff's and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication.

149. Defendant owed a duty of care to Plaintiff and Class Members to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure, to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the Private Information.

150. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

151. Defendant owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard or delete such data and providing notification to Plaintiff and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

152. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

153. Defendant had a duty to implement and maintain reasonable data security practices pursuant to Section 5 of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect sensitive and confidential data.

154. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

155. Defendant was in a superior position to ensure its data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

156. Defendant knew Plaintiff and Class Members relied on it to protect their Private Information. Plaintiff and Class Members were not in a position to assess the data security practices used by Defendant. Because they had no means to identify Defendant's security deficiencies, Plaintiff and Class Members had no opportunity to safeguard their Private Information from cybercriminals. Defendant exercised exclusive control over the Private Information stored on its systems and networks; accordingly, Defendant was best positioned and most capable of preventing the harms caused by the Data Breach.

157. Defendant's duties extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to such risk, or defeats protections put in place to guard against that risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

158. Defendant was aware, or should have been aware, of the fact that cybercriminals routinely target entities storing Private Information through cyberattacks in an attempt to steal valuable Private Information. In other words, Defendant knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

159. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information.

160. The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a) Failing to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure;
b) Failing to adopt, implement, and maintain adequate data security measures to safeguard Plaintiff's and Class Members' Private Information;
c) Failing to adequately monitor the security of its networks and systems to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information;
d) Failing to ensure its systems had plans in place to maintain reasonable data security safeguards;
e) Failing to implement and maintain adequate mitigation policies and procedures;
f) Allowing unauthorized access to Plaintiff's and Class Members' Private Information;
g) Failing to detect in a timely manner that Plaintiff's and Class Members' Private Information had been compromised;
h) Failing to contain and remediate the threat after detecting suspicious activity on its network on May 26, 2025, thereby allowing unauthorized actors to access its network a second time between June 8, 2025, and June 11, 2025; and
i) Failing to timely notify Plaintiff and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages.

161. Defendant's negligent conduct demonstrated a substantial lack of concern for whether injury would result to Plaintiff and the Class. Defendant's actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiff and the Class, whose sensitive personal information Defendant was entrusted to protect.

162. The fact that usable Private Information was accessed and obtained in the Data Breach demonstrates that the Private Information contained in the infiltrated network was not encrypted. Had the information been properly encrypted, the data thieves would have accessed only indecipherable data. This Data Breach could have been prevented through industry standard network segmentation and encryption of confidential information. Further, the Data Breach could have likely been prevented had Defendant utilized appropriate malware prevention and detection technologies.

163. Defendant acted negligently by ignoring its duty—in spite of its knowledge of the ubiquity of data breaches—to ensure its own network and systems had adequate security safeguards to protect Plaintiff's and Class Members' Private Information and to ensure processes were sufficient to detect unauthorized access to its network or compromises of Private Information stored therein.

164. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

165. Defendant violated the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and by failing to comply with applicable industry standards, as described herein.

166. Defendant breached its duties to Plaintiff and the Class under the FTC Act by failing to implement and maintain fair, reasonable, and adequate data security

practices to safeguard Plaintiff's and Class Members' Private Information, and by failing to provide prompt notice of the Data Breach without unreasonable delay.

167. Plaintiff and the Class are within the class of persons the FTC Act intended to protect.

168. As a direct and proximate result of Defendant's negligent conduct, including, but not limited to, its knowing failure to implement and maintain reasonable data security practices and procedures as described above, Plaintiff and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

169. Moreover, as a result of Defendant's negligence in safeguarding Plaintiff's and Class Members' Private Information, Plaintiff and Class Members will have to spend money for future costs of credit monitoring and theft protection which are reasonably necessary given the type of highly sensitive data stolen in the Data Breach.

170. Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiff and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiff and Class Members while it was within Defendant's possession and control.

171. As a direct and proximate result of Defendant's conduct, including, but not limited to, Defendant's failure to implement and maintain reasonable data security practices and procedures, Plaintiff and Class Members have suffered or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and theft of their Private Information; (iii) out-of-pocket expenses

associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost time and opportunity costs associated with efforts expended to address and mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiff and the Class are entitled to damages in an amount to be proven at trial.

172. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

173. The damages Plaintiff and the Class have suffered and will suffer (as alleged above) were and are the direct and proximate result of Defendant's grossly negligent conduct.

174. Plaintiff and the Class have suffered cognizable injuries and are entitled to actual and punitive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
## (On Behalf of Plaintiff and the Class)

175. Plaintiff restates and realleges paragraphs 1 through 143 as if fully set forth herein.

176. Upon information and belief, Defendant entered into contracts, written or implied, with its Clients that contracted with Defendant in connection with the services Defendant provides. Upon information and belief, these contracts are virtually identical between and among Defendant and its Clients around the country.

177. In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class.

178. These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its Clients. Defendant knew that if it were to breach these contracts with its Clients that Plaintiff and Class Members would be harmed.

179. Defendant breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detect the Data Breach and notify Plaintiff and Class Members thereof.

180. Plaintiff and the Class were harmed by Defendant's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

181. Plaintiff and Class Members are also entitled to their costs and attorneys' fees incurred in this action.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

182. Plaintiff restates and realleges paragraphs 1 through 143 as if fully set forth herein.

183. This Count is pleaded in the alternative to Plaintiff's Breach of Third-Party Beneficiary Contract claim.

184. Plaintiff and Class Members conferred a benefit on Defendant by indirectly providing their valuable Private Information to Defendant. Defendant accepted and appreciated that benefit.

185. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including from payments made indirectly to it by Plaintiff and Class Members.

186. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures.

187. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

188. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

189. Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff

and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

190. Defendant acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

191. If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to indirectly provide their Private Information to Defendant.

192. Plaintiff and Class Members have no adequate remedy at law.

193. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered or will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) Plaintiff's Private Information being disseminated on the dark web, according to Google; (ix) statutory damages; (x) nominal damages; and (xi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

194. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

195. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment as follows:

A. An Order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing their counsel to represent the Class;

B. Judgment in favor of Plaintiff and the Class on all counts asserted herein;

C. Awards of damages in amounts to be determined at trial;

D. An award of statutory damages or penalties to the extent available;

E. An award of attorneys' fees and costs, as allowed by law;

F. An award of pre- and post-judgment interest, as provided by law; and

G. Such further relief to which Plaintiff and the Class are entitled.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

DATED: October 2, 2026

Respectfully submitted,

*/s/ Scott Edelsberg*

Scott Edelsberg (SBN 330990)
EDELSBERG LAW, P.A.
1925 Century Park E #1700
Los Angeles, CA 90067
Telephone: 305.975.3320
scott@edelsberglaw.com

*Attorney for Plaintiff and the Class*